**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| KADENCE KREI, legally known as KALEM KREI, <br>                 Plaintiff, <br><br> vs. <br><br> STATE OF NEBRASKA, <br><br> and <br><br> DANNETTE R. SMITH, in her official Capacity as CEO of the Nebraska Department of Health and Human Services <br><br> and <br><br> JASON JACKSON, in his official capacity as Director of the Nebraska Department of Administrative Services, <br><br>                 Defendants. | Case No. 4:19-cv-3068 <br><br> AMENDED COMPLAINT |

1. Plaintiff, Kadence Krei, is a woman who is transgender.

2. Ms. Krei worked as a Development Technician II in the Developmental Disabilities department for the State of Nebraska in the Nebraska Department of Health and Human Services from May of 2018 to February of 2019.

3. The State of Nebraska provides healthcare coverage to State employees through the WellNebraska Health Plan ("Nebraska Plan").

4. The Nebraska Plan was created by the Nebraska Department of Administrative Service for the benefit of employees of the State of Nebraska.

5. Ms. Krei was a Covered Person under the Nebraska Plan while employed by the State of Nebraska.

6. Ms. Krei has a long standing and well documented diagnosis of Gender Dysphoria (DSM-5, 302.85) from multiple treating physicians and psychologists. She has been living as a woman and has been on hormones since 2016.

7. Ms. Krei has met the WPATH Soc7 criteria for gender reassignment surgery and her treating physicians and psychologists have determined that gender reassignment surgery is Medically Necessary to treat her Gender Dysphoria.

8. United Health Care is the plan administrator for the Nebraska Plan and universally recognizes treatment of Gender Dysphoria as Medically Necessary. However, according to the United Health Care, " while [the surgery] may be medically necessary" the Nebraska Plan has customized for its employees "specifically excludes coverage for Services or drugs related to gender transformations." Jennifer Norris, a representative of Administrative Services for the State of Nebraska further clarified that "The decision to include transgendered related surgeries will come by legal requirements or by decisions made by top officials in the state of Nebraska."

9. Under the Nebraska Plan, all State employees are "entitled to Medically Necessary services and supplies". The Nebraska Plan defines "Medically Necessary" as "Health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined by the Claims Administrator or its designee, within the Claims Administrator's sole discretion." The services must be in accordance with Generally Accepted

Standards of Medical Practice; clinically appropriate, not mainly for patient's or doctor's convenience, and not more costly than an alternative.

10. Under the Nebraska Plan, "Covered Health Service" is defined as those services which the Claims Administrator determines to be Medically Necessary, described as a Covered Health Service in the Sections 5 and 6, and not otherwise excluded under Section 8, Exclusions. Sections 5 and 6 of the Nebraska Plan covers hormone replacement, breast construction, vaginoplasty, and related services, but under Section 8, Exclusions, the Nebraska Plan specifically excludes coverage of "sex transformation operations and related services".

11. Despite the broad healthcare coverage provided to every other employee, the Nebraska Plan singles out transgender employees for unequal treatment by categorically depriving them of all coverage of treatment for Gender Dysphoria, even when those treatments are Medically Necessary under Generally Accepted Standards of Care.

12. As a result of the Nebraska Plan's discriminatory exclusion, all medical services that would be necessary to reassign Ms. Krei's gender are specifically covered by the Nebraska Plan for a person who was born a female, but not for a person who was born male. Therefore, Defendants have categorically deprived Ms. Krei coverage for Medically Necessary treatments offered by the plan to other employees but not to Ms. Krei, based on her sex.

13. Defendants have prevented Ms. Krei from receiving Medically Necessary treatment that is prescribed by her physician under the Generally Accepted Standards of

Medical Practice to treat her diagnosis of Gender Dysphoria, including a vaginoplasty and all services related to gender reassignment.

14. Notably, when designing the Nebraska Plan for their state employees, Defendants actively and knowingly customized a plan that would deprive transgender employees of insurance coverage for Medically Necessary treatments on the basis of their sex.

15. As a result of the Nebraska Plan's discriminatory exclusion, Ms. Krei has been forced to pay out of pocket for Medically Necessary treatments prescribed by her physician in accordance with the widely accepted standards of care for treating Gender Dysphoria.

16. The Nebraska Plan's discriminatory exclusion subjected Ms. Krei, as an employee who is transgender, to unequal treatment and denied her a valuable employee benefit that is currently provided to every other State employee who is not transgender.

17. There is no legitimate medical justification for the Nebraska Plan's discriminatory exclusion.

18. In the past, some public and private insurance companies excluded coverage for treatment of gender dysphoria (or "transition-related care") based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, every major medical organization recognizes that such exclusions have no basis in medical science and that transition-related care is effective, safe, and Medically Necessary for treatment of Gender Dysphoria.

19. The Nebraska Plan's discriminatory exclusion lacks any rational basis and is grounded in sex stereotypes, discomfort with gender nonconformity, and moral disapproval of people who are transgender.

20. On its face and as applied to Ms. Krei, the Nebraska Plan discriminates against employees on the basis of sex in violation of the Title VII of the Civil Rights Act of 1964 and deprives transgender employees of equal treatment under the Equal Protection Clause of the Fourteenth Amendment.

21. While working for the state of Nebraska, Ms. Kadence experienced additional discrimination when her Development Technical Shift Supervisor and supervisors in the Human Resources Department refused to call her by her female name and refused to refer to her with female pronouns even in informal conversations or holiday greetings. When she requested that her supervisors and the people working in Human Resources use her female name on informal correspondence, they stated they would not recognize her as female, would not use her female name, and they continued to misgender her with male pronouns.

22. "Deadnaming" is referring to a transgender person by their old name after they identify as their non-natal gender, refusing to address a transgender person by their new name, or using pronouns that are inappropriate to the gender to which they identify. This is also known as "misgendering".

23. Defendants discriminated against Ms. Krei by deadnaming and misgendering her because of her identification as female, her gender non-conforming appearance and behavior, and for being a transgender individual.

24. Defendants discriminated against Ms. Krei by categorically denying her insurance coverage based on her sex.

25. Defendants acted with malice and reckless indifference to Ms. Krei by deadnaming and misgendering her. Ms. Krei eventually resigned from her job with the State of Nebraska due to Defendants' discrimination against her.

26. Ms. Krei brings this Complaint for declaratory and injunctive relief, as well as compensatory and punitive damages.

## JURISDICTION

27. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII"), the Constitution of the United States, and 42 U.S.C. § 1983.

28. This Court has jurisdiction pursuant to Article III of the United States Constitution; 28 U.S.C. §§ 1331, 1343; and 42 U.S.C. § 2000e-5(f)(3).

29. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

30. Compensatory and Punitive Damages are authorized by Title VII and 42 U.S.C. §§1981a(b) and 1983.

## PARTIES

31. Plaintiff Kadence Krei resided in Lincoln, Nebraska, the District of Nebraska, until 2019. She moved from Nebraska to South Carolina in 2019 as a result of the discrimination described herein.

32. Ms. Krei was a Nebraska State employee working at the Department of Health and Human Services in Lincoln, Nebraska from May of 2018 to February of 2019.

33. Defendant Jason Jackson is sued in his official capacity as Director of the Department of Administrative Services, located in Lincoln, Nebraska.

34. The Department of Administrative Service is the State agency responsible for designing and administering the plan the State of Nebraska offers its employees, including selection of exclusions, administration of the plan, and payment or denial of claims.

## VENUE

35. Venue lies with this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because Defendants committed the unlawful employment practice at Ms. Krei's place of employment in this District, in Lincoln, Nebraska.

36. Venue also lies with this Court pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District in Lincoln, Nebraska.

## EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS

37. On March 21, 2019, Plaintiff timely filed two charges with the Nebraska Equal Employment Opportunity Commission against the Nebraska Department of Health and Human Services **(Exhibit A),** and against the Nebraska Administrative Services Department **(Exhibit B)** for employment discrimination based on sex.

38. On March 28, 2019, the NEOC sent a letter to Plaintiff informing her that the United States Equal Employment Opportunity Commission (EEOC) would conduct the initial investigation of both charges.

39. On April 19, 2019, Ms. Krei received two letters from the EEOC informing her that her charges against the Nebraska Department of Health and Human Services **(Exhibit C)** and against the Nebraska Department of Administrative Services **(Exhibit D)** were being assigned to an Investigator.

37. On April 30, 2019, Ms. Krei, through her attorney, filed a Request for Letter of Right to Sue on both charges with the EEOC. **(Exhibit E)**

38. On June 10, 2019, the United States EEOC issued a Right-to-Sue letter to Ms. Krei on her charge against the Nebraska Department of Health and Human Services. **(Exhibit F)**

39. On June 10, 2019, the United States EEOC issued a Right-to-Sue letter to Ms. Krei on her charge against the Nebraska Department of Administrative Services. **(Exhibit G)**

## FACTUAL ALLEGATIONS

### Transgender Individuals and Gender Dysphoria

40. "Gender identity" is a well-established medical concept, referring to one's sense of oneself as belonging to a particular gender. Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the sense of one's gender identity differs from the sex assigned to them at birth.

41. Transgender men are men who were assigned "female" at birth but have a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

42. Experts agree that gender identity has a biological component, meaning that each person's gender identity (transgender and non-transgender individuals alike) is the result of biological factors, and not just social, cultural, and behavioral factors.

43. Regardless of the precise origins of a person's gender identity, there is a medical consensus that gender identity is deep-seated, set early in life, and impervious to external influences.

44. Gender Dysphoria is the diagnostic term for the clinically significant emotional and psychological distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex.

45. Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-10). The criteria for diagnosing Gender Dysphoria are set forth in the DSM-V (302.85).

46. The widely accepted standards of care for treating Gender Dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by the leading medical organizations, including the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics.

47. Under the WPATH standards, Medically Necessary treatment for Gender Dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another. This treatment, often referred to as transition-related care, may include hormone therapy, surgery (sometimes called " sex reassignment surgery" or "gender confirmation surgery"), and other medical services that align individuals' bodies with their gender identities. The exact medical treatment varies based on the individualized needs of the person.

48. According to every major medical organization and the overwhelming consensus among medical experts, the protocol for treating Gender Dysphoria, including

surgical procedures, are effective, safe, and Medically Necessary when clinically indicated to alleviate Gender Dysphoria.

49. In the past, public and private insurance companies excluded coverage for transition-related care based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, the medical consensus is that exclusions of transition-related healthcare have no basis in medical science.

50. For example, in 2008 the American Medical Association ("AMA") passed Resolution 122 recognizing Gender Dysphoria (then known as Gender Identity Disorder, or GID) as a "serious medical condition" which, "if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death." AMA, Resolution 122, Removing Financial Barriers to Care for Transgender Patients (June 16, 2008). The AMA emphatically asserts that "[h]ealth experts in GID, including [WPATH], have rejected the myth that such treatments are 'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and effective treatment for a serious health condition." *Id.*

51. In Resolution 122, the AMA also opposes categorical exclusions of coverage for treatment of Gender Dysphoria when prescribed by a physician, noting that "many of these same treatments are often covered for other medical conditions" and that "the denial of these otherwise covered benefits for patients suffering from GID represents discrimination based solely on a patient's gender identity." *Id.*

52. The American Psychiatric Association, the American Psychological Association, and the Endocrine Society have all issued similar resolutions.

53. Applying contemporary standards of care, Medicare, state Medicaid programs, and private insurers routinely cover transition-related surgery as Medically Necessary treatment for Gender Dysphoria.

**The Nebraska Plan and its Exclusion of Coverage for "Gender Transformation**

54. The State of Nebraska provided and paid for Ms. Krei's healthcare coverage through the Nebraska State Employee Health Plan while she was an employee of the State of Nebraska.

55. The Department of Administrative Services is the State agency responsible for selecting, designing, and administering the Nebraska Plan, including the administration and payment of claims and the insertion of exclusions to coverage.

56. The managed care review company contracted to review claims under the Nebraska Plan is United Health Care, which has taken the position that treatment of Gender Dysphoria is Medically Necessary.

57. In general, the Nebraska Plan states that "[m]embers shall be entitled to Medically Necessary services and supplies, if provided by or under the direction of a Physician." The Nebraska Plan defines "Medically Necessary" as "Health care services or supplies needed to prevent, diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine."

58. Despite this general provision, the Nebraska Plan categorically excludes all "[s]ervices or drugs related to gender transformations" regardless of Medical Necessity.

### Ms. Krei's Medically Necessary Treatment for Gender Dysphoria

59. Ms. Krei is a woman who is transgender. Since 2016, she has been on hormones and presenting as a female.

60. In 2018, Ms. Krei, with referrals from her primary care physician, her surgeon, and her psychologist, sought pre-authorization from the Nebraska Plan's plan administrator (United Health Care) before scheduling a vaginoplasty as part of her Medically Necessary treatment for Gender Dysphoria.

61. United Health Care denied preauthorization in a letter, stating that " while it may be medically necessary" [the employee health plan] " specifically excludes coverage for Services (sic) or drugs related to gender transformations."

62. Ms. Krei timely filed and then lost a first-level appeal with United Health Care because of the categorical exclusion in the Defendant's health plan for "Services (sic) or drugs related to gender transformations."

63. In February of 2019, Ms. Krei resigned from her position with the State of Nebraska, finding the discrimination to be overwhelming, intolerable, and damaging to her mental and physical health.

### LEGAL CLAIMS

### FIRST CLAIM—VIOLATION OF TITLE VII

64. Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

65. Title VII of the Civil Rights Act of 1964 provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C. § 2000e-2(a)(1).

66. The State of Nebraska is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e-(a) and (b).

67. An employer-sponsored health plan is part of the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

68. Discrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of "sex" under Title VII.

69. By categorically excluding coverage for all "transgender services" or services related to "gender transformation," the State of Nebraska has drawn a classification that discriminates based on transgender sex status and gender nonconformity. This is discrimination based on sex.

70. As a result of the exclusion in the Nebraska Plan, non-transgender employees receive coverage for all their Medically Necessary healthcare, but transgender employees do not receive coverage for the health care their doctors deem Medically Necessary.

71. Because medical transition from one sex to another inherently violates gender stereotypes, denying Medically Necessary coverage for such healthcare constitutes impermissible discrimination based on gender nonconformity.

72. The State of Nebraska's exclusion of Medically Necessary care for Ms. Krei's Gender Dysphoria is not based on standards of medical care. It is based on moral disapproval of, discomfort with, and ignorance of transgender people and gender transition.

73. By excluding all healthcare related to "gender transformation" from the only available health plan it provides to employees, the State of Nebraska has unlawfully discriminated against Ms. Krei on the basis of sex in violation of Title VII.

## SECOND CLAIM—VIOLATION OF THE EQUAL PROTECTION CLAUSE

74. Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

75. At all relevant times, Defendants have acted under color of state law.

76. The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall deny to any person within its jurisdiction the equal protection of the laws." State employees are protected by the Equal Protection Clause.

77. By categorically excluding all Medically Necessary "transgender services" or services related to "gender transformation" the State of Nebraska has unlawfully discriminated against Ms. Krei on the basis of sex, which is subject to heightened scrutiny under the Equal Protection Clause.

78. By excluding all healthcare related to "gender transformation" from the only available health plan it provides to employees, the State of Nebraska has unlawfully discriminated on the basis of transgender status, which is independently subject to heightened scrutiny under the Equal Protection Clause.

79. Men and women who are transgender, as a class, have historically been subject to discrimination.

80. Men and women who are transgender, as a class, have a defining characteristic that frequently bears no relation to an ability to perform in or contribute to society.

81. Men and women who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

82. Men and women who are transgender, as a class, are a minority with relatively little political power.

83. The Nebraska Plan's discriminatory exclusion is not narrowly tailored to serve a compelling governmental interest.

84. The Nebraska Plan's discriminatory exclusion is not substantially related to an important governmental interest.

85. The Nebraska Plan's discriminatory exclusion lacks any rational basis and is grounded in sex stereotypes, discomfort with gender nonconformity, ignorance of science, and moral disapproval of people who are transgender.

## RELIEF REQUESTED

86. For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

87. Declaratory relief, including but not limited to a declaration that Defendants violated Title VII and the Equal Protection Clause;

88. Injunctive relief with respect to all Defendants;

89. Compensatory, consequential, and punitive damages with respect to Defendants in an amount to be determined at trial for violation of Title VII and the Equal Protection Clause, including back pay and all remedies available to her under law and in equity;

90. Pre-judgment and post-judgment interest;

91. Plaintiffs reasonable costs and attorneys' fees pursuant to Title VII and 42 U.S.C. §§§ 1988; 1983, and 1981.

92. Such other relief as the Court deems just and proper.

Dated: July __10__, 2019.

_____
Susan M. Napolitano
NSBA #23437
Attorney at Law Berry Law Firm
6940 O Street, Suite 400
Lincoln, Nebraska 68510
402-466-8444